**UNITED STATES of America**

v.

**Himanshu C. SHAH.**

**Crim. No. 73-284.**

United States District Court,
W. D. Pennsylvania.

March 1, 1974.

Kathleen Curtin, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

James E. McLaughlin, Pittsburgh, Pa., for defendant.

---

2. See 10 Del.C. § 6501 et seq.

## OPINION AND ORDER

SNYDER, District Judge.

The Defendant, Himanshu C. Shah, was charged with a violation of the Wire Fraud Statute, Title 18 U.S.C. § 1343.[1] The eleven count Indictment charged that during a period from on or about May 1, 1973, up to and including September 13, 1973, the Defendant made calls on specified dates from a telephone bearing the number 412–362–0613 in Pittsburgh to certain WATS (*Wide Area Telephone Service*) or "toll free" numbers throughout the country. After dialing the numbers, he would then, by means of an electronic device commonly referred to as a "blue box", place a multifrequency tone over the telephone wires (a 2600 cycle per second tone) which would activate the Telephone Company's switching equipment and thereby by-pass the Company's billing system. The Defendant would then place additional tones upon the telephone line, thereby effecting a connection with various individuals in different cities of the United States (See Appendix), Japan, China, and India. Since the Telephone Company would have no record of the interstate and international telephone calls made by the Defendant, he would not be billed for these calls.

The Defendant has moved to suppress two reels of tape *recorded by Agents of the Telephone Company* as the result of the carrier's electronic surveillance of his telephone. These tapes were turned over to the Federal Bureau of Investigation (F.B.I.) A hearing on the Defendant's Motion was held on January 24, 1974. The only witness called was Mr. John R. Harding, Jr., a Senior Security Agent of the Bell Telephone Company.

On the basis of an analysis of certain computer printouts used in the ordinary course of business to detect uncharged calls, it was suspected by mid-August that the Defendant may have been using equipment which by-passed the Company's billing system. On August 27, 1973, Harding initiated a daily computerized survey of the Defendant's telephone. By utilizing certain sophisticated electronic equipment, the Company was able to detect when the "blue box" was used and the "blue box" would activate additional multifrequency equipment. The equipment would record the digits corresponding to the multifrequency tones pulsed by the "blue box". The 2600 cycle tone also activated a mechanism on the detection equipment which permitted the recording of the *beginning portion* of any subsequent phone conversation, whether it was with overseas operators or with private persons. The recording was limited to the first minute of conversation. The Agent testified that on one occasion, the name Himanshu Shah was identified.

After contacting the F.B.I. on September 4, 1973, none of the F.B.I. Agents listened at any time to the conversations being recorded. Mr. Harding further testified unequivocally that it was he personally, without any arrangement with the F.B.I., who had managed all portions of the investigation in order to discover if the Bell Telephone Company's billing system was being circumvented but that the tapes were made after they knew the number from which the calls were being made. After he accumulated all of the necessary information and data (including the tapes of the conversations), he turned everything over to the F.B.I.

The question that this Court must decide is: Can a communications carrier conduct an electronic surveillance by tape recording of a subscriber's telephone in light of Title III of the Omni-

---

1. 18 U.S.C. § 1343: *Fraud by wire, radio, or television*

    "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. Added July 16, 1952, c. 879, § 18(a), 66 Stat. 722, and amended July 11, 1956, c. 561, 70 Stat. 523."

bus Crime Control and Safe Streets Act of 1968 and its prohibitions pertaining to the interception and disclosure of oral communications?

The Omnibus Act (Title 18 U.S.C. § 2511) prohibits interception (except as specified) of oral communications. One exception carved out of the Statute is as follows:

"(2)(a)(i)  It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication: *Provided,* That said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

(ii) It shall not be unlawful under this chapter for an officer, employee, or agent of any communication common carrier to provide information, facilities, or technical assistance to an investigative or law enforcement officer who, pursuant to this chapter, is authorized to intercept a wire or oral communication.

As amended Pub.L. 91–358, Title II § 211(a), July 29, 1970, 84 Stat. 654."

The question arises in the instant case when the carrier admittedly recorded

conversations of the Defendant solely for the purpose of gathering information to be turned over to the authorities to aid in the prosecution of the Defendant.

Since the passage of Title III of the Omnibus Crime Control Act in 1968, there have been no reported cases to which the attention of this Court was directed which deal with the right of a telephone company under 18 U.S.C. § 2511(2)(a)(i) and (2)(a)(ii) to electronically record private conversations of one of its subscribers when the carrier already has sufficient information in its possession to protect its billing procedures.  The legislative history of Title III of the Omnibus Crime Control Act of 1968 disclosed a Congressional intent that Subparagraph (2)(a) would not change the prior law in this area.  At page 2182 of 2 U.S.Code Cong. and Admin.News (1968) it is stated:

"Paragraph (2)(a) provides that it shall not be unlawful for an operator of a switchboard or employees of a common carrier to intercept, disclose, or use wire communications in the normal course of their employment while engaged in any activity which is a necessary incident to the rendition of his service or the protection of rights or property of the carrier. *It is intended to reflect existing law* (United States v. Beckley, 259 F.Supp. 567 (D.C.Ga.1965))."  (Emphasis supplied).

Prior to 1968, a number of cases had arisen under Title 47 U.S.C. § 605 of the Federal Communication Act,[2] which held

2.  47 U.S.C. § 605 provided before the 1968 Amendment:

"No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over

which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for

that there had to exist reasonable grounds for belief that a person using the telephone lines was exceeding his right to the lines before a telephone company could monitor the user's calls.

In United States v. Beckley, *supra,* the question before the Court was whether an indictment based upon evidence discovered by the Government directly from tapes received from the phone company, which had monitored the defendant's calls, should be suppressed as a violation of the defendant's Fourth Amendment rights and their rights to privacy under 47 U.S.C. § 605. The defendants were charged with a violation of the Wire Fraud Statute by devising a scheme to deprive the Telephone Company of monies due and payable for long distance telephone calls by causing the Company to extend to the defendants (via one of its employees) its facilities for unlawful purposes (conducting gambling operations). An employee of the phone company would allow long distance calls to be made without charge and in a manner which by-passed the regular bookkeeping procedures of the company. The Court found that the only reasonable means of protection for the phone company was the monitoring of the calls. The Court said at 259 F.Supp. at pages 571 and 572:

"Section 605 does not prohibit the telephone company from monitoring its own lines. The restrictions placed on the telephone company by Title 47 of the United States Code does not deprive the telephone company of the right to employ reasonable means to detect and prevent violations thereof by its own employees. Where, as is here alleged, a corrupt employee allows long distance calls to be covertly made without charge and in a manner which

bypasses the regular bookkeeping procedures of the company the only reasonable means of protection is the monitoring of such calls.

\* \* \* \* \* \*

A protection intended and afforded by 47 U.S.Code, § 605 does not avail the defendants under the circumstances alleged in this indictment. See United States v. Gallo, 123 F.2d 229, 231 (2 Cir.); United States v. Gris, 247 F.2d 860, 864 (2 Cir.).

As was said in Casey v. United States, 191 F.2d 1, 4 (9 Cir.) reversed on other grounds, 343 U.S. 808, 72 S.Ct. 999, 96 L.Ed. 1317:

'\* \* \* 47 U.S.Code 605, which prohibits the interception and divulgence of communications without the consent or approval of the sender, refers to communications over licensed facilities. The appellants were unlicensed operators transmitting voice messages over an unlicensed station, without call letters, on a portion of the band reserved for Morse Code operations. *The protections of the Act were never intended for, nor do they cover, such communications which are themselves illegal.*' (Emphasis supplied)

See also Sugden v. United States, 226 F.2d 281, 285 (9 Cir.).

The telephonic conversations of the defendants were not monitored in violation of the Fourth Amendment nor 47 U.S.C. § 605 and should not be suppressed." (Emphasis supplied)

In Bubis v. United States, 384 F.2d 643 (9th Cir. 1967), the Telephone Company had reason to believe that one of its subscribers was using a device designed to circumvent the Telephone Company's automatic record keeping equipment. The Company connected certain

the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information

therein contained for his own benefit or for the benefit of another not entitled thereto: *Provided,* That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress. June 19, 1934, c. 652, Title VI, § 605, 48 Stat. 1103."

automatic monitoring equipment to the subscriber's phone which recorded all of his outgoing and incoming calls. The equipment was maintained from December 20, 1965 to March 24, 1966, without the knowledge or consent of the subscriber or any of the persons with whom he spoke. An Agent of the Company advised the United States Attorney's Office of the foregoing facts, and in addition, stated that certain of the recorded conversations sounded like gambling discussions. The Court discussed at length the application of the provisions of 47 U.S.C. § 605 pertaining to unauthorized publication or use of communications, and stated at page 648 the following:

> "We do not believe that in the enactment of Section 605, or in any of the provisions of Title 47, Congress intended to deprive communications systems of their fundamental right to take reasonable measures to protect themselves and their properties against the illegal acts of a trespasser.
>
> \* \* \* \* \* \*
>
> When a subscriber of a telephone system uses the system's facilities in a manner which reasonably justifies the telephone company's belief that he is violating his subscription rights, then he must be deemed to have consented to the company's monitoring of his calls to an extent reasonably necessary for the company's investigation. See Brandon v. United States, 382 F.2d 607 (10th Cir. 1967) and cases therein cited.

The record discloses that the telephone company continued from December 23, 1965, until March 24, 1966, or for a period of three months, to monitor all calls made and received by appellant, and to tape record the conversations of all such calls. In our view the monitoring and tape recording for such length of time, after ample evidence had been secured of the illegal use by appellant of the company's facilities, was unreasonable and unnecessary. To sanction such practices on the part of the telephone company would tend to emasculate the protection of privacy Section 605 was intended to protect.

> In these circumstances the district court erred in admitting into evidence the tape recordings which were produced in response to the subpoena duces tecum."

In a footnote to the above statement, the Court was extremely careful to further clarify its holding:

> "5. In holding that the tape recordings were inadmissible because *the interception* exceeded that necessary to enable the telephone company to determine whether appellant was a trespasser upon its property and, if so, to pursue its remedies against him, we do not mean to suggest that *the disclosure* which occurred would have been lawful if the interception had been properly limited.
>
> The second clause of § 605 prohibits unauthorized divulgence as well as unauthorized interception. Disclosure as well as interception is limited by the consent reasonably implied; that is, *consent to such invasion of the subscriber's privacy as is necessary to protect the telephone company's property*. In the present case, disclosure of what was *said* in appellant's telephone conversations (as distinguished from the fact that the long distance calls were made and not paid for) had no relationship to protecting the telephone company's property. It is equally difficult to find any implied consent by appellant to disclosure for the purpose of convicting him of using interstate telephone facilities for gambling. Disclosure for this purpose contributed nothing either to the collection of long distance tolls that appellant may have owed the company, or to preventing him or others from thereafter using long distance telephone facilities without paying." (Emphasis supplied).

Thus, it would appear that if the tape recordings of the defendant's conversations had been limited by the phone company to establishing that the calls were in violation of the subscription agreement and to the identification of the person using the phone and for those purposes *only*, then the tapes would have been admissible against the defendant. In the instant case, the Telephone Company's monitoring was so limited. The Company only monitored for seven days and the tapes were only of 60 second duration and were employed in an attempt to establish the identity of the caller, and no more; on one occasion Himanshu Shah was identified.

Another pre-1968 case, and one that almost directly parallels our own case, was United States v. Hanna, 260 F.Supp. 430 (1966), affirmed 404 F.2d 405 (5th Cir. 1968), cert. denied, 394 U.S. 1015, 89 S.Ct. 1625, 23 L.Ed.2d 42 (1969). This case concerned an investigation instituted by a Security Officer of the Southern Bell Telephone & Telegraph Company after he was notified by a superior in New York City that they had detected an unusual condition on a certain telephone line in Miami which indicated a "blue box" device was being used on the line to circumvent the toll equipment of the Company. Preliminary investigation determined that the Defendant Hanna was the subscriber, and the Security Officer knew Hanna to be a local gambler and that "blue boxes" were frequently used to conduct their gambling operations. On the basis of this information, the Officer attached certain electronic detection equipment to the line in a manner similar to that implemented in the instant case by Agent Harding on Defendant Shah's line. The monitor operated during the first 35–45 seconds of all telephone calls placed with the "blue box" and ran sporadically for about a month. Based on the evidence accumulated by the tapes, a search warrant was obtained and executed. The agents found and seized not only the "blue box" but also bookmaking paraphernalia. The Defendant was tried and convicted of violations of the Wire Fraud Statute, 18 U.S.C. § 1343, and of the interstate gambling laws, 18 U.S.C. Sections 1084 and 1952.

On appeal, the Court of Appeals of the Fifth Circuit after rehearing, held that a telephone company had a duty to protect its lines of communication from abuses by its subscribers. The Court quoted at length from the original Opinion of Judge Rives and from the original trial record (reported at 393 F.2d 700), and defined the rights and statutory duties of a communications carrier as follows (404 F.2d at p. 407):

"No carrier can discriminate between its customers by extending preferential treatment to any. 47 U.S.C. §§ 202, 203(c). Knowingly to allow those committing electronic toll fraud to receive free service would constitute such discrimination. Furthermore, each carrier is enjoined, under pain of criminal penalty, not to neglect or fail to maintain correct and complete records and accounts of the movements of all traffic over its facilities. 47 U.S.C. § 220. Each carrier is also obliged to collect the federal excise tax levied upon each long distance call. 26 U.S.C. § 4251. * *

' * * * there is no alternative at this state of the art but to make a limited recording of each illegal call —at least of the fraudulent dialing and opening salutations—to:

(i) identify the calling party (the user of the blue box), and others with whom he may be acting in concert * * * identification of the telephone line from which the fraudulent calls are originating must be followed by the more difficult identification of the specific individual making the calls—this is, of course, of paramount importance;

(ii) establish the location from which the calls are originating;

Most blue boxes, for example, are not cumbersome installations but rather, portable devices (some as small as a pack of cigarettes) which can be readily attached to telephone wires by alligator clips.

(iii) record the multifrequency tones being "dialed" (key pulsed) by the blue box; and

(iv) determine whether the fraudulent call was completed (by the called party answering). (R. 63, 68–70, 81–84, 35–38, 42–45.)

Distance (as well as time) is a factor in determining the proper billing charge for a long distance call. It is, therefore, necessary to ascertain each specific location called after the wrongdoer seizes the circuit.' "

The Court thus concluded that the Telephone Company acted reasonably in its attempt to comply with its statutory duties; the tapes were admissible as against the Defendant at his trial, and the Motion to Suppress the tapes was properly denied by the Trial Court. See also Sugden v. United States, 226 F.2d 281 (9th Cir. 1955) affirmed per curiam 351 U.S. 916, 76 S.Ct. 709, 100 L.Ed. 1449; and Arrington v. United States, 350 F.Supp. 710 (E.D.Pa.1972).

The Defendant, Himanshu Shah, by way of his Brief in support of his Motion to Suppress, quotes at length from the dissent of Justice Fortas when writ of certiorari was denied to the Fifth Circuit in the *Hanna* case. Mr. Justice Fortas states at 394 U.S. 1015, 89 S.Ct. 1625, 23 L.Ed.2d 42 (1969) that:

"It is by no means clear that the new statute would authorize this kind of conduct if a similar case occurred today. Unless it did, § 605 would still apply and the same problems that exist in this case would arise again."

This Court is certainly aware of the problems to which Justice Fortas alludes, but is convinced that they are not present in the instant case. The Telephone Company's monitoring did not uncover any evidence of other violations of law other than a violation of the Wire Fraud Statute, and the search warrant issued was only directed to the seizure of the paraphernalia relating to the Defendant's abuse of his subscription agreement with the communications carrier. Therefore, other than the question of the reasonableness of the actions of the Telephone Company in monitoring the Defendant's calls, the other problems of the *Bubis, Beckley*, and *Hanna* cases are not present in the instant case.

At the Suppression Hearing in our case, Bell Security Agent Harding testified that the monitoring of Shah's phone lasted for no longer than 60 seconds per call, and was for the purpose of establishing the identity of the person who was using the subscriber's phone. Also, there was no monitoring of incoming calls whatsoever, and the monitoring lasted no longer than seven days.

Therefore, this Court after an examination of the legislative history of Title 18 U.S.C. § 2511(2)(a)(i) and (ii) and the stated Congressional intent therein that Paragraph (2)(a) "was intended to reflect existing law", and after analyzing the existing cases prior to the passage of 18 U.S.C. § 2511(2)(a)(i) and (ii), and after due consideration of the briefs of counsel, and the testimony given at the Suppression Hearing held on January 24, 1974, finds that:

1. The Telephone Company had sufficient information in its possession for it to reasonably conclude that an electronic device was being utilized to circumvent its billing system; and

2. By the Defendant's activities in using his telephone in a manner contrary to that to which he is entitled as a regular subscriber of phone service, he is deemed to have consented to the Telephone Company's monitoring of his phone calls; and

3. The Telephone Company did not abuse its right to monitor the Defendant's calls, and monitored only to an extent necessary to assure it that the subscriber was indeed the person making the unauthorized calls; and

4. The Telephone Company had the right to turn over the tapes produced as a result of its authorized monitoring to the F.B.I. as a means of protecting its property and rights as a communications carrier as authorized under 18 U.S.C. § 2511(2)(a).(i) and (ii).

This Court therefore concludes that for the reasons stated in the within Opinion, the Motion of the Defendant, Himanshu C. Shah, to Suppress must be denied.

An appropriate Order will be entered.

## APPENDIX

The Indictment charged the Defendant with having made calls on the following dates to phone numbers at the following specified destinations:

NATIONAL CALLS MADE:

| Count No. | Date of Call | Origin of Call | WATS No. Dialed | Destination of Call |
|---|---|---|---|---|
| Count 1 | 9/4/73 | 412-362-0613 | 800-257-1216 (N.J.) | 627-2080 (N.J.) |
| Count 2 | 9/5/73 | 412-362-0613 | 800-257-1218 (N.J.) | 627-2080 (N.J.) |
| Count 3 | 9/6/73 | 412-362-0613 | 800-257-1216 (N.J.) | 627-2080 (N.J.) |
| Count 4 | 9/7/73 | 412-362-0613 | 800-257-1211 (N.J.) | 627-2080 (N.J.) |
| Count 6 | 9/7/73 | 412-362-0613 | 800-257-1216 (N.J.) | 627-2080 (N.J.) |
| Count 8 | 9/8/73 | 412-362-0613 | 800-257-1216 (N.J.) | 627-2080 (N.J.) |
| Count 9 | 9/9/73 | 412-362-0613 | 800-257-1216 (N.J.) | 627-2080 (N.J.) |
| Count 11 | 9/9/73 | 412-362-0613 | 800-257-1216 (N.J.) | 627-2080 (N.J.) |

INTERNATIONAL CALLS MADE:

| Count No. | Date of Call | Origin of Call | WATS No. Dialed | Operator In | Destination |
|---|---|---|---|---|---|
| Count 5 | 9/7/73 | 412-362-0613 | 800-227-1216 (California) | 303-186-081-121 (Tokyo) | Unknown No. In India |
| Count 7 | 9/7/73 | 412-362-0613 | 800-227-1216 (California) | 303-186-081-121 (Tokyo) | Unknown No. In India |
| Count 10 | 9/9/73 | 412-362-0613 | 800-227-1217 (California) | 303-186-852-121 (Hong Kong) | Unknown No. In Hong Kong |